1
2
3
4
5
6
7
8          UNITED STATES DISTRICT COURT

9         SOUTHERN DISTRICT OF CALIFORNIA

10

11   MEGAN RUST, M.D., an individual,        | Case No.: 3:21-cv-00885-BEN-BLM

12                  Plaintiff,

13   v.                                       **ORDER GRANTING
                                              DEFENDANT'S MOTION FOR**
14   LABORATORY CORPORATION OF                **SUMMARY JUDGMENT**
     AMERICA HOLDINGS, a business entity,
15   exact form unknown; and DOES 1 through
     20, inclusive,
16
                    Defendants.               **[ECF No. 16]**
17

18

19

20   **I.    INTRODUCTION**

21        Plaintiff Megan Rust, M.D. ("Dr. Rust") brings this action against Defendant

22   Laboratory Corporation of America Holdings ("Labcorp") for breach of contract and

23   various tort claims related to a working arrangement between herself and Labcorp.

24   Before the Court is Labcorp's Motion for Summary Judgment.  For the reasons set

25   forth below, Labcorp's Motion for Summary Judgment is **GRANTED**.

26   **II.   BACKGROUND**

27        This lawsuit arises from Dr. Rust's performance of pathology services for

28   Labcorp pursuant to a contractual agreement between the parties.

1

A.    **Statement of Facts**[1]

Labcorp "operates a network of clinical laboratories that provide medical testing and diagnostic services."    Declaration of Melissa Thompson, ECF No. 16-6 ("Thompson Decl.") at 2,[2] ¶ 2.  Dr. Rust is a board-certified cytopathologist, who responded to an advertisement to perform part-time pathology services for Labcorp's San Diego laboratory.[3]  Ex. A to Declaration of Christopher J. Kondon, ECF No. 16-4 ("Kondon Decl.") at 23, 29–30; Ex. D to Kondon Decl. at 146.  Melissa Thompson is a cytopathologist and the Anatomic Pathology Manager at the San Diego Labcorp laboratory.  Thompson Decl. at 2, ¶ 3.  Gordana Stevanovic, M.D. ("Dr. Stevanovic") is the Medical Director of Anatomic Pathology at Labcorp's San Diego laboratory.  Declaration of Gordana Stevanovic, ECF No. 16-5 at 2, ¶ 2.  Both Thompson and Dr. Stevanovic interviewed Dr. Rust and selected her for the pathology position.  Ex. D to Kondon Decl. at 146; Ex. A to Kondon Decl. at 17–18.

In August 2020, Dr. Rust and Labcorp executed a Pathology Services Agreement (the "Agreement"), which states that the pathologist (*i.e.*, Dr. Rust) will "provide part-time professional pathology services, as requested" for Labcorp for a term of one-year.  Ex. F to Kondon Decl. at 214; Ex. A to Kondon Decl. at 45–48.  The Agreement contains another clause indicating that Dr. Rust was to serve as an independent contractor for Labcorp, and that nothing in the Agreement "shall be

---

[1]    As an initial matter, the Court notes that Dr. Rust makes numerous objections to the Statement of Uncontroverted Facts attached to Labcorp's Motion for Summary Judgment.  The Court notes that most of Dr. Rust's arguments related to the Statement of Uncontroverted Facts are in exhibits and not her moving papers.  Regardless, the Court only addresses those objections relevant to the facts set forth in this Order.  Not all facts herein are material, but many are relevant.

[2]    Unless otherwise indicated, all page number references are to the ECF-generated page number contained in the header of each ECF-filed document.

[3]    Dr. Rust disputes this fact arguing she was looking for full-time work.  However, Dr. Rust testified that the advertisement was for part-time work.  Ex. A to Kondon Decl. at 23; Ex. A to Declaration of Anthony K. McClaren, ECF No. 17-1 ("McClaren Decl.), at 32.  As such this fact is not disputed and all objections are **OVERRULED**.

2

deemed to create an employer/employee relationship." Ex. F to Kondon Decl. at 218–19.  A separate section governs compensation for services, which includes different pay rates for different pathology services provided.  *See id.* at 217–18, 229–30. Finally, the Agreement contains what is known as an integration clause explaining that it "constitutes the entire understanding between the parties hereto concerning the subject matter herein and is a complete statement of the terms thereof and shall supersede all previous understandings between the parties, whether oral or written with respect to the subject matter herein." *Id.* at 226.  The clause further directs that "[t]he parties shall not be bound by any representation made by either party or agent of either party that is not set forth in this Agreement." *Id.*  Dr. Rust signed the Agreement and initialed each page.  *Id.* at 214–38; Ex. A to Kondon Decl. at 47–48.

Labcorp did not provide malpractice insurance, so Dr. Rust was required to obtain insurance herself.  Ex. A to Kondon Decl. at 24–25; Ex. J to Kondon Decl. at 259–60.  Dr. Rust asked Dr. Stevanovic about insurance options, including whether to obtain part-time or full-time coverage.  Dr. Rust obtained a full-time malpractice insurance policy.  Ex. A to Kondon Decl. at 41.

On August 24, 2020, Dr. Rust began working at Labcorp and she worked the entire week.  Ex. A to Kondon Decl. at 154–55; Ex. G to Kondon Decl. at 240.  When Dr. Rust started working for Labcorp, she also held a locum position at a lab in New Jersey, where she was providing in-person services two weeks per month until the New Jersey lab could find a new doctor.  Ex. A to Kondon Decl. at 40–41.  The New Jersey lab said that finding a new doctor could take until July 2021. *Id.*  By November 2020, the New Jersey locum position had ended due to COVID-19 impacting travel.[4]

---

[4]     Dr. Rust disputes this fact arguing that the November 2020 dates misstates the evidence, and that the COVID-19 travel restrictions are irrelevant.  However, Dr. Rust's declaration states that by November 2020, her "New Jersey job had ended early . . . ." *See* Declaration of Megan Rust, ECF No. 17-2 ("Rust Decl.") at 4, ¶ 17.  In addition, the reason for the New Jersey locum position ending is not only relevant but material to Dr. Rust's claims for intentional and negligent misrepresentation.  *See infra* Part IV.D.–E.  As such, Dr. Rust's objections are **OVERRULED**.

1   *Id.* at 43–44.

2       Dr. Rust worked for Labcorp the following days between September 2020 and

3   December 2020: (1) twelve days in September; (2) five days in October; (3) fifteen

4   days in November; and (4) eighteen days in December.  Ex. A to Kondon Decl. at 51–

5   53; Ex. G to Kondon Decl. at 241–44.  In mid-December, Dr. Rust informed Labcorp

6   she could not work the week of January 4 through 8, 2021 and Thompson offered Dr.

7   Rust three days of work in January outside of that week.  Ex. I to Kondon Decl. at 256.

8   Dr. Rust sent an email to Thompson asking why she was only needed four days in

9   January, stating "[t]hat is much less than part-time."  Ex. K to Kondon Decl. at 262.

10  Thompson responded that January is a low volume month and because Dr. Rust was

11  not available on January 7 or 8, 2021, she was scheduled for the four days when other

12  pathologists were off.  *Id.*  That same day, Dr. Rust reached out to Linda Guay

13  reporting: (1) issues with Thompson's management style; (2) that four days in January

14  is much less than part-time; and (3) that part-time amounts to 20 hours per week.  Ex.

15  L to Kondon Decl. at 267.  Guay responded that her understanding of Dr. Rust's

16  position was that she was hired as a part-time contractor to be used as needed to

17  provide coverage when other pathologists were off schedule.  *Id.* at 266.  On December

18  27, 2021, Dr. Rust informed Thompson that due to unforeseen circumstances,[5] she

19  would not be able to work any days in January.  Ex. I to Kondon Decl. at 256.

20      In late January 2021, Thompson asked Dr. Rust if she could work five days in

21  February 2021,[6] and Dr. Rust responded that she was busy and would get back to her

---

22  [5]  Dr. Rust objects to this fact as cumulative, irrelevant, and on the basis of attorney-
23  client privilege.  The fact is not material to the Court's decision.  It is included to provide
24  factual background of the events leading up to the filing of this lawsuit.  In addition,
     although Dr. Rust may have been seeking counsel at that time, no attorney-client
25  communications are included in the statement.  As such, Dr. Rust's objections are
26  **OVERRULED**.

27  [6]  Dr. Rust objects to this fact and supporting evidence as irrelevant, and improper
     hearsay.  Dr. Rust argues that only 25 percent of one-page of the document constitutes
28  admissible evidence.  Dr. Rust does not explain what portions are not admissible or
     what portions are supposed hearsay.  In addition, for purposes of this specific statement,

4

later in the week.  Ex. I to Kondon Decl. at 257.  In mid to late February, Thompson asked if Dr. Rust was still busy—having not heard back about the February dates—and inquired about Dr. Rust's availability for five days in March.  *Id.*  Dr. Rust responded that her attorney was in contact with Labcorp's corporate counsel[7] but that she considered herself still under contract.  *Id.*; *see also* Ex. A to Kondon Decl. at 91–92.  Dr. Rust declined all requests to work in 2021.[8]  Ex. I to Kondon Decl. at 257; Ex. A to Kondon Decl. at 91–92.

### B. Procedural History

Dr. Rust filed her Complaint in state court on March 24, 2021.  ECF No. 1-3 ("Compl.") at 2.  On May 7, 2021, Labcorp removed the case to this Court based on diversity jurisdiction, 28 U.S.C § 1441.  *See* ECF No. 1.  Labcorp answered the Complaint and the parties engaged in discovery.  *See* ECF Nos. 3, 6, 11.  On June 6, 2022, Labcorp filed the instant Motion for Summary Judgment, or in the Alternative, Partial Summary Judgment.  ECF No. 16 ("MSJ").  Dr. Rust filed an Opposition and Labcorp replied.  ECF No. 17 ("Oppo."); ECF No. 18 ("Reply").

## III. LEGAL STANDARD

"A party is entitled to summary judgment if the 'movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *City of Pomona v. SQM North America Corp.*, 750 F.3d 1036, 1049 (9th Cir. 2014) (quoting Fed. R. Civ. P. 56(a)).  A fact is material if it could affect the outcome of the case under governing law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

---

the Court is only using that portion of which Dr. Rust included in her own declaration. *See* Rust Decl. at 3, ¶ 15.  As such, Dr. Rust's objections are **OVERRULED**.

[7]   Dr. Rust objects to this statement as cumulative and compound.  Dr. Rust states essentially the same fact in her declaration.  Rust Decl. at 4, ¶¶ 19, 21.  As such, Dr. Rust's objections are **OVERRULED**.

[8]   Dr. Rust objects by arguing the statement lacks foundation, misstates the facts, is irrelevant, and contains privileged attorney-client information.  However, there are no attorney-client communications, and Dr. Rust essentially admits this fact by arguing that as an independent contractor, she had the right to decline to perform services in 2021.  As such, Dr. Rust's objections are **OVERRULED**.

242, 248 (1986).  A dispute of material fact is genuine if the evidence, viewed in light most favorable to the non-moving party, "is such that a reasonable jury could return a verdict for the non-moving party." *Id*.  "The moving party initially bears the burden of proving the absence of a genuine issue of material fact." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  If the moving party meets its burden, the non-moving party must go beyond the pleadings to establish a genuine issue of material fact, using affidavits, depositions, answers to interrogatories, admissions, and specific facts.  *See Celotex*, 477 U.S. at 324; *see also* FED. R. CIV. P. 56(c)(1)(A) (purported factual disputes must be accompanied by "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials . . . .").

"The court must view the evidence in the light most favorable to the nonmovant and draw all reasonable inferences in the nonmovant's favor." *City of Pomona*, 750 F.3d at 1049.  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Id.* (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  Moreover, the non-moving party's mere allegation that factual disputes exist between the parties will not defeat an otherwise properly supported motion for summary judgment.  *See* FED. R. CIV. P. 56(c); *see also Phytelligence, Inc. v. Washington State Univ.*, 973 F.3d 1354, 1364 (Fed. Cir. 2020) ("[M]ere allegation and speculation do not create a factual dispute for purposes of summary judgment.") (quoting *Nelson v. Pima Cmty. College*, 83 F.3d 1075, 1081–82 (9th Cir. 1996)).  "The court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3).

## IV.   **<u>DISCUSSION</u>**

Labcorp moves for summary judgment, or alternatively, partial summary judgment as to Dr. Rust's claims.

### A.   **Breach of Contract**

Dr. Rust and Labcorp entered into the Agreement, wherein Dr. Rust agreed to provide "part-time, as requested" pathology services to Labcorp as an independent contractor.  Dr. Rust's Complaint alleges that before entering the Agreement, Dr. Stevanovic promised her full-time work.  Dr. Rust further asserts (in her Opposition) that she was supposed to work part-time, two weeks per month at Labcorp for the first few months, before going full-time.  Labcorp requests the Court exclude extrinsic evidence of any prior oral Agreement because it is barred by the parol evidence rule.  Labcorp also asserts that even if extrinsic evidence is considered, the conduct of the parties establishes that the intent was for Dr. Rust to work part-time.  As such, Labcorp seeks summary judgment as to Plaintiff's breach of contract claim.   The Court concludes that certain evidence is barred by the parol evidence rule, and that the admissible extrinsic evidence establishes that Lacorp did not breach the Agreement.

### i.   Parol Evidence Rule

Labcorp argues the Agreement specifically provides that Dr. Rust was to provide part-time professional pathology services, and not full-time services.  MSJ at 12.  Labcorp further argues that Dr. Rust bases her argument that the Agreement was for full-time work on discussions with Dr. Stevanovic that occurred before the Agreement was executed.  *Id.*  Labcorp contends that because "the express terms of the Agreement state otherwise, [] the parol evidence rule bars Dr. Rust from relying on any oral or written discussions with Dr. Stevanovic or others to contradict the written terms of the Agreement."  *Id.*  Labcorp also points out that the Agreement contains an "Entire Agreement" provision, which states that the Agreement constitutes the entire understanding between the parties, includes the complete statement of terms, and supersedes any previous understandings.  *Id.* at 13.

Dr. Rust does not necessarily dispute that certain evidence at issue implicates the parol evidence rule.  *See generally* Oppo.  However, Dr. Rust argues the evidence is not barred because the meaning of "part-time" and "full-time" is wholly ambiguous,

and extrinsic evidence is required to interpret the Agreement.  Oppo. at 7–9.  Dr. Rust argues this alleged ambiguity presents a dispute of material fact, inappropriate for resolution at the summary judgment stage.  *Id.* at 9.

The parol evidence rule "generally prohibits the introduction of any extrinsic evidence, whether oral or written, to vary, alter or add to the terms of an integrated written instrument."  *Casa Herrera, Inc. v. Beydoun*, 32 Cal. 4th 336, 343 (2004) (citing *Alling v. Universal Mfg. Corp.*, 5 Cal. App. 4th 1412, 1433 (1992)).  In California, two initial inquiries are required for the parol evidence analysis.  *Hebert v. Rapid Payroll, Inc.*, No. CV 02-4144 DT-PJWx, 2003 WL 25760149, at *8 (C.D. Cal. Nov. 17, 2003) (citing *Brinderson–Newberg Joint Venture v. Pacific Erectors, Inc.*, 971 F.2d 272, 276–77 (9th Cir. 1992)).  First, "was the writing intended to be an integration, i.e. a complete and final expression of the parties' agreement, precluding any evidence of collateral agreements[?]"  *Id.*  Second, "is the agreement susceptible of the meaning contended for by the party offering the evidence?"  *Id.*  Extrinsic evidence is only allowed "to explain the meaning of a written contract ... [if] the meaning urged is one to which the written contract terms are reasonably susceptible."  *Casa Herrera*, 32 Cal. 4th at 343 (quoting *BMW of North America, Inc. v. New Motor Vehicle Bd.*, 162 Cal. App. 3d 980, 990 n.4 (1984)).

Here, the Agreement contains an integration clause stating that the Agreement constitutes the entire understanding between the parties and supersedes all prior understandings, whether written or oral.  Ex. F to Kondon Decl. at 226.  The integration clause also states that the parties are not bound by any representation made that is not contained in the Agreement.  *Id.*  Based on this clause, the Court finds the Agreement is integrated.  *See Hebert*, No. CV 02-4144 DT-PJWx, 2003 WL 25760149, at *8 (holding an agreement was integrated based on an integration clause contained therein); *see also Laub v. Horbaczewski*, No. LA CV 17-06210-JAK-KS, 2019 WL 1744845, at *5 (C.D. Cal. Jan. 2, 2019) (citing *Alling*, 5 Cal. App. 4th at 1434) (holding that whether an agreement is integrated is a question of law for the

court).

Dr. Rust is correct that California recognizes an exception to the parol evidence rule when the terms of an agreement are ambiguous, but such evidence is only allowed "to explain an extrinsic ambiguity or otherwise interpret the terms of the agreement . . . ." CAL. CIV. PROC. CODE § 1856 (g).   Furthermore, "while evidence of the circumstances under which the agreement was made or to which it relates," can be used to explain ambiguities or interpret terms, evidence of *consistent, additional terms*, cannot be introduced to supplement or even explain an integrated Agreement. CAL. CIV. PROC. CODE § 1856 (b), (g); *Sherman v. Mut. Benefit Life Ins. Co.*, 633 F.2d 782, 785 (9th Cir. 1980) (citing *Masterson v. Sine*, 68 Cal.2d 222 (1968)) ("Because the parties intended the termination provision to be complete, the district court properly concluded that the parol evidence ruled [sic] barred admission of any oral agreement which supplemented rather than explained that provision."); *U.S. Bank, N.A. v. Miller*, No. CV 12-05632 MMM-MANx, 2013 WL 12114100, at *8 (C.D. Cal. Sept. 30, 2013) ("The parol evidence rule   prohibits   the   introduction   of   extrinsic   evidence to contradict or supplement a contract that is intended to be a final expression of the parties' agreement and a complete and exclusive statement of *its terms*.   Extrinsic evidence   is   admissible,   however,   to   explain   or   interpret ambiguous contract language.") (citations omitted); *Grumpy Cat Ltd. v. Grenade Beverage LLC*, No. SA CV 15-2063 DOC-DFMx, 2017 WL 9831408, at *6 (C.D. Cal. Dec. 1, 2017) ("The parol evidence rule   prohibits   use   of   extrinsic   evidence to contradict or supplement a  fully  integrated contract where the contract is intended to be a final expression of that agreement and a complete and exclusive statement of the terms. If the contract purports to be integrated, then extrinsic evidence is excluded, except to explain or interpret ambiguous language.") (citations and internal quotation marks omitted).

Here, because the Agreement is integrated, extrinsic evidence can only be used to explain an ambiguity or interpret the terms.  The Agreement reads that Dr. Rust was

to "provide part-time professional pathology services, as requested . . . ." by Labcorp for a period of one-year.  Ex. F to Kondon Decl. at 214.  The Agreement also states that Dr. Rust would render her services as an independent contractor, and that nothing in the Agreement should be deemed to create an employer/employee relationship.  *Id.* at 218–19.  Separately, these terms appear unambiguous but taken together, the Court finds ambiguity.   The language "part-time, as requested" is indicative of an employer/employee relationship, whereas an independent contractor is just that.  Labor law cases often distinguish between employees and independent contractors, making the two categories of workers to some extent, mutually exclusive.  However, "part-time, as requested" does not necessarily imply that the relationship will be an employee/employer relationship.  Here, the compensation plan is consistent with an independent contractor type relationship, given that Dr. Rust was to be paid a certain amount per slide reviewed/service provided, which varied with the slide/service itself.  As such, the hours worked one day may differ from the hours worked another day and will vary with the slides reviewed and the pace at which Dr. Rust chose to work.  The total time worked for any given day was up to Dr. Rust and appears to depend on the services required, including the total number of slides reviewed.

With this in mind, Dr. Rust's argument is flawed—she is not asking the Court to determine what "part-time, as requested" or "independent contractor" means.  Instead, Dr. Rust argues that the Agreement was for full-time work, and claims that both "part-time" and "full-time" are ambiguous.   Dr. Rust also argues, in her declaration, that "part-time" means two weeks per month on a temporary basis.  Rust Decl. at 2–3, ¶ 8.  Dr. Rust's proffered readings of the Agreement contradict the plain meaning, because she ignores the specific language therein.  First, there is no mention of the term "full-time" to be explained or interpreted.  Clearly, "part-time, as requested services" are distinct from "full-time" services.  Second, the Agreement makes no promise of set hours or days, let alone two weeks per month.  Services provided "part-time, as requested" are distinct from services provided part-time, two weeks per

month, because one reading promises established hours, while another reading bases hours on Labcorp's need.

Had Dr. Rust asked the Court to interpret whether she was a Labcorp employee, providing part-time services, or an independent contractor, the analysis might be different.[9]  But Dr. Rust's briefing admits she was an independent contractor.  There, she acknowledges that "[a]s an independent contractor, Plaintiff had the right to decline assignments . . . ."  ECF No. 17-4 at 6.  The Court notes that Labcorp's arguments also, to some extent, miss the mark, given the lack of focus on Dr. Rust's independent contractor status.  However, Labcorp does argue there is no evidence it breached the Agreement and because Dr. Rust failed to respond with evidence of breach, the Court agrees.  *See infra* Part IV.A.ii.

Given the context above, the most reasonable reading of the Agreement, based on the explicit language therein, is that Dr. Rust was to serve as an independent contractor for Labcorp, on a part-time basis, for one-year.  This reading arguably leaves some ambiguity as to the number of hours the parties expected Dr. Rust to work but regardless, the Court need not reach that analysis.  Dr. Rust seeks to include evidence that she was promised full-time work and/or two weeks per month for the first few months.  These purported terms either contradict or modify the language of the Agreement, which reads that the services provided were to be "part-time, as requested" on an independent contractor bases, for a one-year period.  Interpreting the Agreement as providing full-time services would contradict the "part-time, as requested language."  Interpreting the Agreement to mean that Dr. Rust would receive two weeks of work per month for the first few months: (1) supplements the "part-time"

---

[9]       Even then, there is a chance Dr. Rust may not be allowed to be an "employee" of Labcorp, given California's restraint on the corporate practice of medicine.  *See Conrad v. Med. Bd. of California*, 48 Cal. App. 4th 1038, 1049–1052 (1996) (explaining how various California statutory provisions do not allow corporations to hire physicians as employees but finding that treating physicians as independent contractors may be permissible).  However, the Court makes no express findings regarding the legality of the contract based on the corporate practice of medicine.

and compensation plan language with established hours; (2) contradicts the "as requested" language, which deliberately leaves potential hours undefined; and (3) contradicts the language defining the Agreement period as "one-year," because there is no language indicating that the terms would change during the requisite timeframe. Because the evidence proffered by Dr. Rust[10] would both contradict and supplement the Agreement, it is barred by the parol evidence rule.

### ii.   Intent and Conduct of the Parties

Labcorp further argues that even if the Court were to consider extrinsic evidence of Dr. Rust's alleged conversations with Dr. Stevanovic regarding promises of full-time work, her claim would still fail. MSJ at 13. Labcorp asserts that "at no point in time did [Dr. Rust] work for Labcorp on a full-time basis," and "[t]he conduct of the parties prior to any controversy between them is consistent with the specific terms of the Agreement." *Id.* Labcorp cites the following in support of its argument that the parties' conduct conclusively shows the intention of the Agreement was for Dr. Rust to work part-time: (1) Dr. Rust's admission that the advertisement for the position indicated the work was part-time; (2) Dr. Rust's written requests that the draft agreement be revised to specifically reference part-time work; and (3) Dr. Rust's additional edits to the Agreement, incorporating several references that her position would be part-time (which was supposedly necessary for Dr. Rust to continue her other work on a locum basis). *Id.* at 13–14.

Dr. Rust disputes that the advertisement for the position was part-time, arguing:

---

[10]   The Court notes that even if Dr. Rust's evidence of a prior Agreement was permitted, it would not be enough to survive summary judgment. Dr. Rust relies primarily on her own self-serving declaration and deposition testimony, which are not corroborated by the evidence submitted. *See Centurion Med. Liab. Protective Risk Retention Grp. Inc. v. Gonzalez*, 296 F. Supp. 3d 1212, 1217 (C.D. Cal. 2017) ("Conclusory or speculative testimony in affidavits and moving papers is insufficient to raise a genuine issue of fact and defeat summary judgment."). As noted *infra*, Dr. Rust herself understood the position to be part-time, as needed. *See infra* Part IV.A.ii.; Ex. E to Kondon Decl. at 148.

12

(1) she was seeking full-time work when she responded to the ad; (2) that the position had a full-time component and was never intended to be completely part-time; and (3) that the term part-time is ambiguous, creating a triable issue of fact. Oppo. at 5, 9; ECF No. 17-5 at 2.

As an initial matter, not all evidence proffered by the parties constitutes parol evidence—*i.e.*, a prior oral or contemporaneous agreement that contradicts the Agreement at issue. Some of the evidence submitted originated after the Agreement was executed, and much of the evidence that originated prior to the Agreement's execution is consistent with and does not supplement the terms therein. Reviewing all permissible extrinsic evidence on record, the Court notes that the conduct and intent of the parties is consistent with Labcorp's position that the Agreement is not for full-time work, or two weeks per month for the first few months. Most importantly, the extrinsic evidence shows no breach of the Agreement by Labcorp and an absence of a genuine issue of fact.

First, Labcorp is correct that allowing permissible extrinsic evidence to explain the terms of the Agreement only weakens Dr. Rust's arguments. Dr. Rust's email correspondence with Lisa Wicker[11] indicates that Dr. Rust understood the position to be for part-time, as needed work. In fact, it appears Dr. Rust requested such language be included in the Agreement. *See* Ex. E to Kondon Decl. at 148 ("I am told that I am being hired as a part-time/as needed and that may not even be two weeks/month. So I made these changes with this in mind so that I can continue to work locum when LabCorp does not need me."). Because this evidence is consistent with the terms of the Agreement, it may be introduced to help explain any ambiguity respecting the terms "part-time, as requested." The evidence also starkly contrasts with Dr. Rust's more recent declaration and deposition testimony.

Second, both parties discuss the Labcorp advertisement for a part-time

---

[11] Lisa Wicker is employed at Labcorp as a Director of Pathology Services. Declaration of Lisa Wicker, ECF No. 16-7 at 2, ¶ 2.

pathologist, to which Dr. Rust responded. Dr. Rust's deposition testimony reflects that the advertisement was for part-time work. Ex. A to Kondon Decl. at 23; Ex. A to McClaren Decl. at 32. Dr. Rust now argues that the pathology position—and not necessarily the advertisement—was for full-time work, and that this evidence is inadmissible, because Lacorp did not include the original advertisement in the record. As noted *supra*, the Court overrules objections to this evidence. *See supra* Part II.A. at n.3. Per Dr. Rust's deposition testimony, she perceived the advertisement to be for part-time work. This testimony does not evidence a separate agreement but constitutes evidence of the circumstances surrounding the Agreement and is consistent with the terms therein.

Third, Dr. Rust relies heavily on evidence that she obtained full-time insurance coverage instead of a part-time policy. However, even the correspondence with her insurance contact indicates that Dr. Rust understood the position to be part-time for up to one-year. In an email to the insurance executive, Dr. Rust stated that Dr. Stevanovic thought full-time "might be best" but that she wanted to hear what the insurer's Membership Services had to say, because she "may still be [part-time] for the first year." Ex. P to Kondon Decl. at 293. This evidence is consistent with the Agreement's terms, which provide for "part-time, as requested" services for one-year. As requested, or as needed positions can at times, depending on need, exceed what one might normally consider part-time, making a full-time policy a prudent choice. For example, Dr. Rust's eighteen days of work in December may not have been full-time but may have exceeded the hours covered by a part-time policy. However, the Court will not speculate, because the terms of any such policies were not included in the record. Regardless, the evidence surrounding Dr. Rust's full-time insurance policy does not create a genuine dispute of material fact respecting the terms of the Labcorp Agreement.

Finally, in the months following the execution of the Agreement, Dr. Rust did not work full-time hours at Labcorp as she asserts in her Complaint and Opposition.

14

*See* Compl. at 5, ¶ 20; 8, ¶ 40; Oppo. at 8.  Dr. Rust's deposition testimony paints a different picture, given the admission that she did not provide full-time services for Labcorp during 2020.  *See* Ex. A to Kondon Decl. at 51–53; Ex. G to Kondon Decl. at 241–44.  Dr. Rust asserts that she worked full-time in August because she started August 24, 2020 and worked the entire week.  Rust Decl. at 3, ¶ 13.  However, this is only one week of the month.  The closest Dr. Rust came to "full-time" was during the month of December 2020 when she worked eighteen days.  However, also in December, Dr. Rust sent an email to Linda Guay, reporting that she had not been scheduled enough days in January.  Dr. Rust specifically noted that she was not being scheduled for part-time hours, because part-time (in her view) constituted 20 hours per week.  Ex. L to Kondon Decl. at 267.  Guay responded with her understanding that Dr. Rust was a part-time, as needed, Labcorp pathologist, meaning there was no guarantee of a certain number of hours.  *Id.*  Dr. Rust's statements reflect an understanding that the position was part-time, and Guay's statements indicate the position was part-time, as needed thus consistent with the Agreement.  However, Dr. Rust's comment regarding the "20 hours" is likely inadmissible evidence because, as discussed *supra*, a set number of hours both attempts to supplement and contradict the language of the Agreement.  Regardless, given her continued use of the term part-time, Dr. Rust cannot now argue that there exists a genuine issue of fact such that a jury could find she contracted for and understood the Agreement as promising her full-time work, or part-time at two weeks per month temporarily until she started full-time.

In conclusion the Agreement promised Dr. Rust "part-time, as requested" work to be performed as an independent contractor, with Labcorp for one-year.  The corroborated extrinsic evidence is consistent with the terms of the Agreement.  Labcorp requested that Dr. Rust work certain days of each month during that one-year period, until Dr. Rust informed Labcorp that her lawyer was in contact with Labcorp's corporate counsel.  As such, there is no evidence that Labcorp breached the Agreement.  Accordingly, the Court **GRANTS** Labcorp's Motion for Summary as to

15

1    the breach of contract claim.

2        **B.    Breach of the Implied Covenant of Good Faith and Fair Dealing**

3        Dr. Rust concedes that Labcorp's motion is proper respecting her breach of good

4    faith and fair dealing claim.  Oppo. at 8.  Accordingly, Labcorp's Motion for Summary

5    Judgment is **GRANTED** as to Dr. Rust's claim for breach the implied covenant of

6    good faith and fair dealing.

7        **C.    Intentional Interference with Prospective Economic Advantage**

8        Dr. Rust also claims Labcorp tortiously interfered with her work at another lab.

9    Under California law, a plaintiff alleging a claim for relief for intentional interference

10   with prospective economic advantage must  prove: "(1) an economic relationship

11   between the plaintiff and some third party, with the probability of future economic

12   benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3)

13   intentional [wrongful] acts on the part of the defendant designed to disrupt the

14   relationship; (4) actual disruption of the relationship; and (5) economic harm to the

15   plaintiff proximately caused by the acts of the defendant." *Sybersound Recs., Inc. v.

16   UAV Corp.*, 517 F.3d 1137, 1151 (9th Cir. 2008) (quoting *Korea Supply Co. v.

17   Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1153 (2003)).

18       Labcorp argues that there is no evidence that Dr. Rust's economic relationship

19   with any third party has been harmed as a result of Labcorp's actions.  MSJ at 16.

20   Labcorp further argues that "reducing Dr. Rust's working hours is not evidence of an

21   actual disruption in an economic relationship between Dr. Rust and a third party," and

22   there is no evidence supporting a claim of intentional interference with prospective

23   economic advantage.  *Id.*  Labcorp further argues that "Dr. Rust admitted at her

24   deposition that there is no factual basis for her claim in the Complaint that Labcorp

25   accused her of bad performance." *Id.*  Essentially, Labcorp is arguing that no evidence

26   exists indicating that Labcorp interfered with Dr. Rust's economic relationship with a

27   third party.  Dr. Rust counters that she has "identified third parties with whom she had

28   prospective economic advantage opportunities," and that Labcorp interfered.  Oppo.

3:21-cv-00885-BEN-BLM

at 9–10.  Specifically, Dr. Rust argues she had opportunities with OMNI Pathology and that Labcorp, acting with knowledge of these opportunities, "disclosed negative and derogatory information about Dr. Rust . . . ."  *Id.* at 10.

Labcorp has met its initial burden of proof, because there is no evidence in the record indicating that anyone from Labcorp took action that interfered with Dr. Rust's relationship with a third party.  Labcorp points to Dr. Rust's deposition testimony confirming her belief that her December 2020 performance review by Labcorp was not a negative review.  Ex A to Decl. at 63, 69–72; Ex. O to Decl. at 287 (Performance Review of Dr. Rust).  Dr. Rust further testified that she did not think twice about her review, and that she was not upset or displeased with the review or suggestions therein.  *Id.*  This evidence, along with the absence of evidence that Labcorp contacted a third party about Dr. Rust's performance shows there is no genuine dispute of material fact.

Dr. Rust cites only her own declaration stating that she is informed and believes that Labcorp's agents, including Thompson and Dr. Stevanovic, contacted OMNI (and "other potential employers") and spoke poorly of Dr. Rust's work performance.  Rust Decl. at 5, ¶¶ 28–29.  The declaration explains that Dr. Rust learned this information from Michelle Herrera at OMNI Pathology.  *Id.* at 5, ¶ 27.  Dr. Rust's declaration is not corroborated by any evidence in the record and is insufficient to survive summary judgment.  *Galloway v. Mabus*, No. 11-cv-00547-BEN-NLS, 2013 WL 435932, at *5 (S.D. Cal. Feb. 4, 2013) ("The Ninth Circuit has refused to find a genuine issue where the only evidence presented is uncorroborated and selfserving testimony.") (listing cases); *see also F.T.C. v. Neovi, Inc.*, 604 F.3d 1150, 1159 (9th Cir. 2010), *as amended* (June 15, 2010), *amended*, No. 09-55093, 2010 WL 2365956 (9th Cir. June 15, 2010) ("The district court was on sound footing concluding that [the plaintiff] put forward nothing more than a few bald, uncorroborated, and conclusory assertions rather than evidence.").  Dr. Rust might have deposed or obtained a declaration from Michelle Herrera or supplied deposition testimony from Dr. Stevanovic, Thompson, and/or Lisa Wicker regarding the allegations.  She does not.  Instead, Dr. Rust relies solely on her

17

own declaration, which appears at least somewhat inconsistent with her prior deposition testimony.

Dr. Rust's declaration provides the Court with only a scintilla of self-serving evidence, but more is required to succeed on summary judgment. *See Anderson*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."). As such, there is insufficient evidence to create a genuine issue of material fact regarding whether Labcorp had knowledge of any relationship between Dr. Rust and OMNI, let alone took any intentional action that disrupted that relationship. Accordingly, the Court **GRANTS** Labcorp's Motion for Summary Judgment as to Dr. Rust's claim for intentional interference with prospective economic advantage.

### D. <u>Intentional Misrepresentation</u>

As an alternative to her breach of contract claim, Dr. Rust asserts Labcorp intentionally misrepresented the quantity of work to be done. "The essential elements of a count for intentional misrepresentation are (1) a misrepresentation, (2) knowledge of falsity, (3) intent to induce reliance, (4) actual and justifiable reliance, and (5) resulting damage." *Chapman v. Skype Inc.*, 220 Cal. App. 4th 217, 230–31, 162 Cal. Rptr. 3d 864, 875 (2013) (citing *Lazar v. Superior Court*, 12 Cal.4th 631, 638 (1996); *Mirkin v. Wasserman*, 5 Cal.4th 1082, 1088–1089 & n.2 (1993)).

Dr. Rust bases her claim for intentional misrepresentation on Dr. Stevanovic's alleged assurances that she would be given full-time work. MSJ at 17. Labcorp contends that there is no evidence to go to a jury because: (1) Dr. Rust admitted the advertisement for her position was for part-time work; (2) Dr. Rust requested in writing that the Agreement include language making clear that her work would be part-time/as needed; and (3) Dr. Rust admitted that she discontinued her work in New Jersey due to a rise in COVID-19 cases, which made travel inadvisable. *Id.* Labcorp also argues that Dr. Rust testified "she did not believe Dr. Stevanovic intended to

18

mislead her when discussing the possibility that Labcorp would need her services on a full-time basis." *Id.* (citing Ex. A to Kondon Decl. at 100). Dr. Rust counters that summary judgment cannot be granted because "the record is so convoluted with regard to what was agreed upon, and what was understood at th[e] time . . . ." Oppo. at 10. Dr. Rust explains "that she expected, and that [Labcorp] provided, access to some form of 'full-time' employment . . . ." *Id.* Dr. Rust also contends that "the statements by LabCorp and Dr. Stevanovic cannot be conclusively defined as 'predictions regarding future events'" as Labcorp argues in its Motion. *Id.*

Because Dr. Rust's arguments related to her intentional misrepresentation claim are presented without citations to the record, it is difficult to find genuine issues of material fact. *See* Oppo. at 10. In disputing Labcorp's evidence, Dr. Rust *argues* her deposition testimony is mischaracterized. Turning to the testimony, when asked whether Dr. Rust believed that Dr. Stevanovic deliberately lied to her about anticipated full-time work, Dr. Rust testified "No. I -- I feel that she -- she said that I would be getting full time." Ex. A to Kondon Decl. at 100. Immediately after, Dr. Rust was asked "[a]nd you believe that at the time [Dr. Stevanovic] said that, she meant it, she just was wrong?" *Id.* To this, Dr. Rust replied "[y]ou never know with Stevanovic." *Id.* Dr. Rust appears to say that Dr. Stevanovic did not deliberately or knowingly lie to her but in the same breath, says that she does not know. *See id.* Again, Dr. Rust provides the Court with only a scintilla of evidence—her own self-serving testimony—insufficient to defeat summary judgment. *Anderson*, 477 U.S. at 252.

More important is Labcorp's argument respecting Dr. Rust's alleged reliance on Dr. Stevanovic's supposed representations. Statements from Dr. Rust establish there was no actual reliance on any alleged promise of full-time work. Dr. Rust herself testified that her New Jersey locum ended due to COVID-19 impacting travel and not because Dr. Stevanovic promised her a full-time position should she stop working in New Jersey. Ex. A to Kondon Decl. at 40–41. This deposition testimony directly contradicts the Complaint, which alleged Dr. Rust ended her New Jersey locum based

3:21-cv-00885-BEN-BLM

on Dr. Stevanovic's representations. *See* Compl. at 4, ¶¶ 9–10. This is a material fact that goes to the required element of actual/justifiable reliance. Based on Dr. Rust's deposition testimony, there is no genuine dispute of material fact as to whether she relied on Dr. Stevanovic's alleged representations when deciding to end her New Jersey locum position. Because actual reliance is a required element of intentional misrepresentation, the Court **GRANTS** Labcorp's Motion for Summary Judgment on this claim.[12]

### E. <u>Negligent Misrepresentation</u>

"Under California law, '[t]he elements of negligent misrepresentation are (1) the misrepresentation of a past or existing material fact, (2) without reasonable ground for believing it to be true, (3) with intent to induce another's reliance on the fact misrepresented, (4) justifiable reliance on the misrepresentation, and (5) resulting damage.'" *Gross v. Metro. Life Ins. Co., N.Y., N.Y.*, No. 12-cv-02478-H-JMA, 2013 WL 1628138, at *3 (S.D. Cal. Apr. 12, 2013) (quoting *Nat'l Union Fire Ins. Co. v. Cambridge Integrated Servs. Grp., Inc.*, 171 Cal. App. 4th 35, 50 (2009)).

Labcorp argues that Dr. Rust's claim for negligent misrepresentation fails for the same reasons her intentional misrepresentation claim fails. MSJ at 18. Likewise, Dr. Rust makes the same counterarguments respecting negligent misrepresentation as she did for intentional misrepresentation. Oppo. at 10–11. Because justifiable reliance is an element of negligent misrepresentation, the Court **GRANTS** summary judgment as to this claim for the same reasons stated above. *See supra* Part IV.D.

### F. <u>Punitive Damages</u>

In light of the above holdings, Dr. Rust has no remaining claims and therefore, cannot recover punitive damages. As such, the Court will not address the parties' arguments.

---

[12] The Court also notes how the record reflects Dr. Rust's own understanding that her position with Labcorp was part-time, adding further support to this Court's holding that she did not rely on a representation that her work would be full-time. *See supra* Part IV.A.ii.

V.    **CONCLUSION**

For the reasons set forth above, the Court **GRANTS** Labcorp's Motion for Summary Judgment in its entirety.

**IT IS SO ORDERED.**

Dated: January 30, 2023

**HON. ROGER T. BENITEZ**
United States District Judge

21